UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                :
JEROME FARNVILLE,               :
                                :
        Petitioner,             :    Civ. No. 17-542 (NLH)
                                :
    v.                          :    OPINION
                                :
STEVEN JOHNSON,                 :
THE ATTORNEY GENERAL FOR THE    :
STATE OF NEW JERSEY,            :
                                :
        Respondents.            :
_____:

APPEARANCES:
Jerome Farnville, No. 633146/C-270942
New Jersey State Prison
PO Box 861
Trenton, NJ 08625
    Petitioner <u>pro</u> <u>se</u>

Kim L. Barfield
Cumberland County Prosecutor's Office
115 Vine Street
Bridgeton, NJ 08302
    Counsel for Respondents

<u>HILLMAN, District Judge</u>

    Petitioner Jerome Farnville ("Petitioner"), a prisoner

presently incarcerated at New Jersey State Prison in Trenton,

New Jersey, has filed a Petition for a Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254 (the "Petition").  ECF No. 1.

Respondents Steven Johnson and the Attorney General for the

State of New Jersey ("Respondents") filed an Answer to the

Petition (the "Answer").  ECF No. 4.  For the following reasons,

the Court will deny the Petition and a certificate of

appealability shall not issue.

## I.  BACKGROUND

In its opinion on direct appeal, the Superior Court of New
Jersey, Appellate Division, provided the following summary of
the factual background of Petitioner's case:

> On September 12, 2005, Hamilton Blackshear
> (Blackshear) was shot and killed outside of
> the home of his son, Albert Blackshear
> (Albert). Prior to the shooting, Albert had
> been involved in several disputes with
> Kenneth Bartee (Bartee) about a purported
> sexual relationship between Albert and
> Bartee's girlfriend, which culminated in a
> physical altercation between the two at a
> party on September 10, 2005. In retaliation,
> Albert set fire to Bartee's grandmother's
> house, where Bartee had been living.
>
> On September 12, 2005, Bartee broke into
> Albert's house and stole his clothing,
> electronics, and other valuables. Later that
> evening, Blackshear accompanied Albert to
> the house to retrieve Albert's remaining
> property, and change the locks. After
> Blackshear exited the house, Albert heard "a
> loud noise like a bang." Blackshear ran back
> into the house, told Albert he had been
> shot, and fell to the floor in the living
> room. Albert called 9-1-1. Blackshear later
> died from his gunshot wounds.
>
> Detective Rick Pierce of the Bridgeton
> Police Department responded to the scene of
> the shooting. Albert told the detective that
> he had recently been involved in a fight
> with Bartee at a party, and gave him the
> names of possible suspects. Detective Pierce
> narrowed the suspects to defendant, Bartee,
> Andrew Swinton (Swinton), William Rothmaller
> (Rothmaller, a/k/a Pop Tart), Archie Perry
> (Perry), Charles Clark (Clark), and Brian
> Baldwin (Baldwin).

In a taped statement Clark gave the police
on September 27, 2005, he said that he,
Bartee, Perry, Baldwin, and Hector Ruiz
drove to Albert's house in Perry's van
because Bartee wanted to fight Albert. They
met defendant, Swinton, and Rothmaller on
the way. The men arrived at Albert's house
and exited their respective vehicles. As
they were walking toward the house, Clark
saw that both defendant and Swinton had
sawed-off shotguns. When Clark reached the
bushes by the side of the house, he saw a
man exit the back door, and then heard a
gunshot. He did not see who had fired that
shot, but said "it was between [Swinton] and
[defendant]." Clark saw defendant fire a
second shot. After the second shot, Clark
and Bartee ran back to Perry's van and left
the area. Clark did not know that someone
had been killed until he read about it in
the newspaper the next day. Swinton
threatened to shoot anyone and their family
who talked about the shooting, and stated
that he was going to shoot Perry and Perry's
father because they had already gone to the
police.

In a taped statement Perry gave to the
police on September 30, 2005, he said that
on September 12, 2005, he was at Baldwin's
house when Bartee asked Perry to give him a
ride to Albert's house so that Bartee could
steal Albert's dog. Clark, Baldwin, and Ruiz
joined them. As the five men were leaving
Baldwin's house in Perry's van, Bartee
received a call from Swinton. The men
eventually met up with Swinton, who had
defendant and Rothmaller in his car. The two
vehicles then proceeded to Albert's house.

Bartee had told Perry that there would be no
one at Albert's house; however, if Albert
was there, Bartee was going to "fight him."
When the group arrived at the house, the
lights were on, the doors were open, and
there was someone in the house. Bartee

3

called Swinton, and the two decided to "go
ahead" with their plan. Perry told Bartee
that he did not want to be involved, dropped
Bartee and Clark off at Swinton's vehicle,
and drove down the street and parked. Perry
saw Swinton and two other men get out of
Swinton's car, and noticed the man in the
back seat reach over and grab a long black
object that looked like a sawed-off shotgun.
The three men then ran toward Albert's
house. Within ten or fifteen minutes, Perry
heard two gun shots that sounded exactly the
same, indicating they came from the same
gun. Bartee and Clark then ran back to
Perry's van and got inside. Perry said that
they were "[n]ervous, ... they tell me they
think Pop Tart shot a victim. They didn't
even know who got shot." The three men then
drove from the scene. During the drive,
Bartee said "this wasn't supposed to happen.
I can't believe this happened[,]" and Clark
said he was "scared and nervous." The next
day, Bartee told Perry that Albert's father
had been killed, and "the shooter gave out a
message that if anyone tells he was gonna
get them before he goes in." Clark told
Perry to "just keep your mouth shut. You had
nothing to do with this."

Based on Clark's and Perry's statements,
Detective Pierce concluded there was
probable cause to arrest defendant, Swinton,
and Rothmaller, the individuals that Clark
and Perry had identified. The three men were
arrested on October 5, 2005, brought to
police headquarters for questioning, and
placed in separate rooms.

Defendant received and waived his *Miranda*
rights prior to any questioning by Detective
Pierce and Detective George Chopek. He
denied involvement in, or knowledge of, the
shooting, and said that he had learned about
it from a newspaper article. Detective
Pierce told defendant that he had been
implicated in the shooting, and Swinton and
Rothmaller were giving statements to that

effect. Defendant did not believe the detective and said he would "roll the dice" and not give a statement. Defendant then invoked his right to remain silent and requested an attorney. At that point, all questioning about the case stopped. Thereafter, the detectives "probably made small talk," told defendant they believed he was being untruthful, and "very possibly" said to him "that [they] were interested in hearing his side of the story." Detective Pierce asked defendant to call him if he changed his mind about giving a statement.

Detective Calabrese then took defendant to the processing area, where Swinton was being processed. Detective Calabrese reported to Detective Pierce that defendant overheard Swinton tell another detective that he was going to take the detective to retrieve the guns, and that defendant had a startled look on his face when he heard this. The detectives had not planned for defendant to overhear Swinton's statement.

On October 6, 2005, defendant called the Criminal Investigation Division of the Bridgeton Police Department and asked to speak to Detectives Pierce and Chopek. Defendant did not speak to the detectives that day. He spoke to them on October 7, 2005, at the Prosecutor's Office, where, after receiving and waiving his *Miranda* rights, he gave a taped statement explaining what had occurred the night of the shooting. According to defendant, Bartee called him and said that he wanted defendant, Swinton, and Rothmaller to go with him to Albert's house to "beat up or rob" Albert. Prior to arriving at Albert's house, the three men, who were in Swinton's car, met up with Bartee, who was in Perry's van. Bartee exited Perry's van, went to Swinton's car, and obtained a loaded shotgun from defendant, who was sitting in the rear seat. Bartee gave defendant a .357 caliber handgun, which defendant put in his

waistband. Swinton may have had a sawed-off
shot gun as well. Swinton's car then
followed Perry's van to Albert's house. When
they arrived there, they squatted down in
the nearby brush. Defendant saw a man exit
the back door, heard a shot from a shot gun,
and then ran back to Swinton's car.
Defendant took the gun out of his waistband
when he was running back to the car.
Defendant was not sure if it was Bartee's or
Swinton's shotgun that was fired, but he
thought it was Bartee's "[c]ause it ... was
his beef[,]" and Bartee was the one who was
upset with Albert for trying to burn down
his grandmother's house. The next day
defendant read in the newspaper that someone
had been killed.

Before trial, defendant and co-defendants
Bartee, Swinton, Rothmaller, and Baldwin,
filed a motion to suppress their statements
to the police. Following a *Miranda* hearing,
the trial judge denied defendant's motion,
holding that defendant knowingly,
voluntarily and intentionally waived his
rights. The judge found that the detectives
had stopped questioning defendant after he
requested an attorney; defendant
subsequently re-initiated contact with the
detectives and asked to speak to them;
defendant received his *Miranda* rights a
second time before giving the statement; and
he acknowledged that he understood his
rights by initialing the *Miranda* card.

Defendant was tried separately from his co-
defendants. Police Officer Dominick
Patitucci testified that he responded to the
scene following the shooting. He also
executed a search warrant on defendant's
residence and seized a .357 caliber handgun
containing ammunition, and one shotgun
shell.

Detective Michael Donato testified that,
with Swinton's sister's consent, he searched
her apartment. During the search, Swinton's

sister directed him to a duffle bag
containing two shotguns matching the
description of the weapons used in the
shooting. The officer also discovered
shotgun shells.

State Trooper Randolph Toth of the New
Jersey State Police Ballistics Unit
testified that because of the types of
barrels on the guns retrieved during the
searches, the bullets that killed Blackshear
could not be identified as having come from
a particular gun.

Clark and Perry testified about their taped
statements, as well as their and defendant's
involvement in what had occurred the night
of the shooting.

State v. Farnville, No. A-0169-09T1, 2012 WL 469456, at *1–5

(N.J. Super. Ct. App. Div. Feb. 15, 2012).

Following a jury trial, defendant was
convicted on count one of first-degree
felony murder, on count three of first-
degree armed robbery, on count four of
second-degree robbery, on count seven of
third-degree unlawful acquisition of a
firearm, and on counts ten and eleven of
second-degree conspiracy to commit robbery
and burglary. In convicting defendant on
count three the jury did not find beyond a
reasonable doubt that he was armed with a
shotgun. The jury also found defendant not
guilty on count six of possession of a
shotgun for an unlawful purpose, and on
count twelve of possession of a sawed-off
shotgun. At sentencing, the trial judge
merged the convictions on counts four and
ten with count one and sentenced defendant
to an aggregate sixty-year term of
imprisonment with an eighty-five percent
period of parole ineligibility pursuant to
the No Early Release Act (NERA), *N.J.S.A.*
2C:43-7.2.

Id. at *1.

Petitioner subsequently appealed his conviction and sentence to the Appellate Division, where he raised the following claims:

> POINT I
>
> THE TRIAL COURT ERRED, TO DEFENDANT'S GREAT PREJUDICE, IN REFUSING TO ADMIT AN EXCITED UTTERANCE THAT A CO-DEFENDANT WAS THE SHOOTER. *U.S. CONST.,* AMEND. XIV; *N.J. CONST.* (1947), ART. 1, PAR. 10.
>
> POINT II
>
> THE STATE ENGAGED IN MISCONDUCT BY INTENTIONALLY PRESENTING HIGHLY PREJUDICIAL VICTIM-IMPACT TESTIMONY, AND THE TRIAL COURT FAILED TO ATTEMPT TO REMEDIATE IT, TO DEFENDANT'S GREAT PREJUDICE. *U.S. CONST.,* AMEND[ ]. XIV; *N.J. CONST.* (1947), ART. 1, PAR. 10.
>
> POINT III
>
> THE OFFICERS VIOLATED THE DEFENDANT'S RIGHT TO SILENCE AND TO COUNSEL BY CONTINUING TO QUESTION HIM AFTER HE HAD REQUESTED COUNSEL, NECESSITATING SUPPRESSION. *U.S. CONST.,* AMENDS. V, VI, XIV; *N.J. CONST.* (1947), ART. 1, PAR. 10.
>
> POINT IV
>
> THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

Id.

In a pro se submission, Petitioner also raised the following:

POINT I

THE TRIAL COURT COMMITTED PLAIN ERROR FOR
NOT HAVE TAKEN JUDIC[I]AL NOTICE []
THEREBY[] DEPRIVING APPELLATE OF DUE-
PROCESS-OF-LAW, U.S. CONST. A[MENDS]. 6, 14;
N.J. CONST. (1947), ART. 1, PAR 10. (NOT
RAISED BELOW)

Id. (alterations in original).

     The Appellate Division reversed Petitioner's conviction for

first-degree robbery, finding that the verdict sheet had been

incomplete and had not provided the jury with all of the

appropriate questions "that could have led the jury to find

defendant guilty of first-degree robbery beyond a reasonable

doubt." Id. at *10. However, the Appellate Division affirmed

the remainder of Petitioner's convictions, as well as his

sentence. See id. at *11. The New Jersey Supreme Court denied

certification of Petitioner's direct appeal on September 25,

2012. See State v. Farnville, 52 A.3d 177 (N.J. 2012).

     Petitioner subsequently filed his petition for post-

conviction relief ("PCR") in state court. See ECF No. 4-13 at

2. Petitioner challenged his trial counsel's alleged failure

to: (1) file a motion for a new trial based upon a lack of

sufficient evidence to support the verdict, and (2) object to

numerous prejudicial issues. See ECF No. 4-14 at 18-25.

Following oral argument, the court denied Petitioner's PCR on

the record.  See ECF No. 4-15 at 2.  On appeal, Petitioner

raised only the following claim:

> POINT ONE
>
> DEFENDANT IS ENTITLED TO AN EVIDENTIARY
> HEARING ON HIS CLAIM THAT HIS TRIAL ATTORNEY
> RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

State v. Farnville, A-3226-13T2, 2015 WL 6697619, at *4 (N.J.

Super. Ct. App. Div. Nov. 4, 2015).

The Appellate Division affirmed the denial of Petitioner's

PCR application.  See id.  On March 30, 2016, the Supreme Court

of New Jersey denied certification of Petitioner's PCR appeal.

See State v. Farnville, 135 A.3d 147 (N.J. 2016).

In January 2017, Petitioner filed the instant habeas

petition, pro se.  See ECF No. 1 at 14.  Petitioner raises two

claims: (1) there was insufficient evidence to support his

conviction for felony murder, and (2) "the Appellate state

court's fact finding conclusions were unreasonable and clearly

erroneous."  Id. at 8-10.

## II.  STANDARD OF REVIEW

A petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 is the proper mechanism for a state prisoner to challenge

the fact or duration of his confinement where the petitioner

claims his custody is in violation of the Constitution or the

laws of the United States.  See 28 U.S.C. § 2254(a); Cullen v.

Pinholster, 563 U.S. 170, 181 (2011); Preiser v. Rodriquez, 411

U.S. 475, 498-99 (1973).  A habeas petitioner bears the burden of establishing his entitlement to relief for each claim presented in the petition.  See Harrington v. Richter, 562 U.S. 86, 98 (2011).

The standard used in reviewing habeas claims under § 2254 depends on whether those claims have been adjudicated on the merits by the state court.  If they have not been adjudicated on the merits, the Court reviews de novo both legal questions and mixed factual and legal questions.  See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).  If the state court adjudicated the claim on the merits, then 2254(d) limits the review of the state court's decision as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . .

28 U.S.C. § 2254(d).

If a claim has been adjudicated on the merits in state court,[1] this Court has "no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Parker v. Matthews, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529

---

[1] "[A] claim has been adjudicated on the merits in State court proceedings when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground." Lewis v. Horn, 581 F.3d 92, 100 (3d Cir. 2009) (quoting Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009)). "Section 2254(d) applies even where there has been a summary denial." Pinholster, 563 U.S. at 187. "In these circumstances, [petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision." Id. (quoting Harrington v. Richter, 562 U.S. 86, 98 (2011); see also Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted.").

U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." Parker, 567 U.S. at 48-49 (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" Williams, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A]n unreasonable application of federal law," however, "is different from an incorrect application of federal law." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Williams, 529 U.S. at 410).

## III. DISCUSSION

### A. Exhaustion

Before reviewing the claims contained in the Petition, the Court must determine whether Petitioner has exhausted them in state court.  See 28 U.S.C. § 2254(b).  To satisfy the exhaustion requirement in § 2254(b), "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including a petition for discretionary review before the State's highest court.  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  "[I]f the petitioner fails to satisfy the exhaustion requirement prior to filing a federal habeas petition and none of the exceptions apply, the federal court is precluded from granting habeas relief to the petitioner."  Lambert v. Blackwell, 134 F.3d 506, 513-14 (3d Cir. 1997).  The Court may, however, deny a habeas petition "on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

It appears from the record that both of Petitioner's claims are unexhausted.  However, because the grounds for relief raised in the Petition may be denied on the merits without regard to exhaustion pursuant to § 2254(b)(2), the Court will decline to

engage in an exhaustion analysis as it is unnecessary to the disposition of the Petition.

## B. Sufficiency of the Evidence

Petitioner first alleges that his conviction for felony murder was against the weight of the evidence and should be set aside.  See ECF No. 1 at 8-9.  In support of his claim, Petitioner states: "[T]here was not one shred of evidence (either direct or circumstantial) from which one could reasonably infer that Farnville had any foreknowledge that Bartee was going to rob Albert, let alone attempt to kill him or, that he, Farnville wanted to see Albert killed."  Id. at 8. As evidence of that assertion, Petitioner points to a pre-trial statement he gave to police in which he alleged that on the night of the murder he had "no idea where they were going."  Id. See also ECF No. 4-7 at 71.

A claim that the jury's verdict was against the weight of the evidence raises a Fifth Amendment due process concern.  Only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" should a writ issue.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also Cavazos v. Smith, 565 U.S. 1, 4 (2011).  This standard must be applied "with explicit reference to the elements of the criminal offense as defined by state law."

<u>Jackson</u>, 443 U.S. at 324, n. 16.  <u>See also</u> <u>Orban v. Vaughn</u>, 123

F.3d 727 (3d Cir.1997), <u>cert. denied</u>, 522 U.S. 1059 (1998).

Here, Petitioner was convicted of first-degree felony

murder under N.J. Stat. Ann. § 2C:11-3(a)(3) which states, in

relevant part:

> a. Except as provided in N.J.S.2C:11-4,
> criminal homicide constitutes murder when:
>
> [. . .]
>
> (3) It is committed when the actor,
> acting either alone or with one or more
> other persons, is engaged in the
> commission of, or an attempt to commit,
> or flight after committing or attempting
> to commit robbery, sexual assault, arson,
> burglary, kidnapping, carjacking,
> criminal escape or terrorism pursuant to
> section 2 of P.L.2002, c. 26 (C.2C:38-2),
> and in the course of such crime or of
> immediate flight therefrom, any person
> causes the death of a person other than
> one of the participants

N.J. Stat. Ann. § 2C:11-3.

In his § 2254 claim, Petitioner emphasizes that he was

allegedly unaware that co-defendant Kenneth Bartee ("Bartee")

intended to rob or murder Albert Blackshear ("Albert"), and that

this lack of intent militated against a conviction for felony

murder.  <u>See</u> ECF No. 1 at 8-9.  Contrary to Petitioner's

assertion however, Petitioner admitted in a taped statement to

police that he went to Albert's house knowing the intention was

to "beat [Albert] up or rob him."  ECF No. 4-7 at 65.

> [DETECTIVE]: [Albert] [s]et [Bartee's]
> grandmother's house on fire?
>
> [PETITIONER]: Yea
>
> [DETECTIVE]: and what did Kenny want to do
> after that?
>
> [PETITIONER]: He wanted to go to his house
> and, I guess beat him up or rob him.
>
> [DETECTIVE]: So he wanted, [Bartee] wanted
> to go to Albert's house and beat him up or
> rob him?  And what did he go, call, did
> [Bartee] call Al, or Andrew to, for back up
> or to go along with him for help or
> anything?
>
> [PETITIONER]: I guess he just wanted us
> there for backup.
>
> [DETECTIVE]: For backup. And that's sort of
> how you got drug into this, isn't it?
>
> [PETITIONER]: Yea . . . .

Id.

Later in that same statement, Petitioner again admits that

he knew Bartee's intent was to rob Albert and steal items from

Albert's home.

> [DETECTIVE]: Prior to going on tape when we
> were briefly discussing this you had made
> mention that [Bartee] had told you that they
> had been to [Albert's] house before this?
>
> [PETITIONER]: Yea
>
> [DETECTIVE]: What
>
> [PETITIONER]: They said they gonna take a TV
> from his house

[DETECTIVE]: When did this happen do you
know?

[PETITITONER]: The same night I guess. They
said yea, we just left from the house we
took a TV from there, we're going back,
follow us.

[DETECTIVE]: So [Bartee] had actually said
they went to the house.

[PETITIONER]: Yea

[. . .]

[DETECTIVE]: He mention taking anything else
from the house?

[PETITIONER]: No

[DETECTIVE]: No?

[PETITIONER]: Said they was going back to
get some more stuff

[DETECTIVE]: And that's when you guys went
along, or and followed them

[PETITIONER]: Uh huh, yea

Id. at 81.

This statement to police was played in its entirety at

trial. See ECF No. 4-21 at 82. Petitioner's co-defendant

Charles Clark ("Clark") also testified at trial. See id. at 8-

47. Clark stated that on the night of the murder, he had gone

with Bartee, Petitioner, and several other individuals to

Albert's house to either "confront" Albert and "take some

property," or to "break into [Albert's] house and take the dog

and anything else maybe we wanted." Id. at 10-11. Clark

testified that upon arriving at Albert's house, he met up with Petitioner and saw that Petitioner was armed with a gun. <u>See</u> <u>id.</u> at 11. After several of the men, including Clark, Bartee, and Petitioner, approached Albert's house, they saw an individual exit the back door. <u>See id.</u> Clark testified that he then saw Petitioner "let off a shot", and that there was no doubt in Clark's mind that Petitioner was the one who had fired his weapon. <u>See id.</u> at 13. Clark stated that, at the time, he was unaware of what had happened to the individual who had come out of the back door of the house, but that he learned the following day Blackshear had died. <u>See id.</u>

The record presented at trial clearly demonstrates that there was sufficient evidence for a rational trier of fact to find that Petitioner had committed felony murder. Petitioner admitted to joining up with other men to rob Albert, and during this encounter Blackshear was killed. These facts satisfy the elements to sustain a charge of felony murder pursuant to N.J. Stat. Ann. § 2C:11-3(a)(3). Accordingly, Petitioner has failed to demonstrate that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319. He is not entitled to relief on this claim.

### C. Appellate Division's "Fact Finding Conclusions"

Petitioner's second contention is that the Appellate

Division's "fact finding conclusions" in their opinion denying his PCR appeal were "unreasonable and clearly erroneous." ECF No. 1 at 10. See also ECF No. 1-1 at 32. Similar to his first claim for relief, Petitioner asserts that the Appellate Division's determination that there was "abundant evidence" to sustain a charge of felony murder was "unreasonable in light of the entire trial record." Id. at 34.

On appeal from the denial of his PCR petition, Petitioner's sole argument was that he should have been granted an evidentiary hearing on whether his trial counsel had been ineffective for failing to file a motion for a new trial based upon insufficient evidence. See id. at 4. The Appellate Division held that an evidentiary hearing was unnecessary because the record supported the fact that there was "abundant evidence" to sustain Petitioner's felony murder charge. See id.

Petitioner now argues that this determination by the Appellate Division was incorrect because the court "mischaracterized the evidence" and "ignore[ed] [the] evidence" that contradicted Petitioner's guilt. ECF No. 1-1 at 36. Petitioner points to the following as demonstrative of his innocence: (1) he never spoke directly to Bartee; (2) he was never informed of what Bartee had planned; (3) he was not present when Bartee initially "planned his revenge"; (4) he had no motive to conspire to commit robbery or murder; and (5) the

jury had rejected Clark's testimony that Petitioner was armed with a gun and "let off a shot", when the jury found Petitioner not guilty of possession of a weapon for an unlawful purpose and not guilty of possession of a prohibited weapon.  See id. at 34-36.

Although Petitioner phrases his claim in terms of the Appellate Division's "factual findings", Petitioner instead appears to take issue with the Appellate Division's conclusion that there was sufficient evidence to support the charge of felony murder.  Petitioner appears to allege that this was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Parker, 567 U.S. at 40 (internal quotation marks and citation omitted).

As discussed previously, a federal habeas court may only grant a writ if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  Significantly, an "unreasonable" application of law is different from an "incorrect" application of law.  See Harrington, 562 U.S. at 101.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of the state court's decision."  Id. (quoting Yarborough v. Alvarado, 541 U.S. 652,

664 (2004)).

Here, the issue raised before the Appellate Division was whether Petitioner's trial counsel had been ineffective. The Appellate Division was not asked to rule on whether the evidence had been sufficient to sustain a charge of felony murder. Nevertheless, in arriving at its determination that trial counsel had not been ineffective, the Appellate Division did state in its opinion that there had been "abundant evidence" presented at trial to support a felony murder charge against Petitioner. See Farnville, 2015 WL 6697619, at *4. This Court does not find that conclusion was unreasonable, as this Court has already determined that there was indeed sufficient evidence presented for a rational trier of fact to find the essential elements of felony murder beyond a reasonable doubt.

Although Petitioner contends that he never spoke directly to Bartee, that he was never informed of what Bartee had planned, that he was not present when Bartee initially "planned his revenge", and that he had no motive to conspire to commit robbery or murder, Petitioner's taped statement to police demonstrates that he knew Bartee intended to go to Albert's house to either "beat [Albert] up or rob him" and that Petitioner was going to meet Bartee at Albert's house for "backup." See ECF No. 4-7 at 65. This evidence is sufficient to find that Petitioner was in the commission of, or in an

attempt to commit, a robbery with Bartee and the other co-defendants.  See N.J. Stat. Ann. § 2C:11-3(a)(3).

Moreover, while Petitioner emphasizes the fact that the jury did not find that Petitioner himself had been in possession of a shotgun, this is not required for a felony murder conviction.  See id.  A felony murder conviction only mandates that during the commission, or attempt to commit a robbery, *one* of the participants in that robbery causes the death of someone who was not a participant.  See id.  Even if Petitioner had not been the individual who shot Blackshear, Petitioner admitted during his statement to police that one of the participants had shot Blackshear; thereby satisfying the requirement needed to sustain a charge of felony murder against Petitioner even if he did not fire the fatal shot himself.  See ECF No. 4-7 at 73-78. Accordingly, the Appellate Division was not unreasonable in concluding that there was sufficient evidence to support a felony murder charge against Petitioner, and he is not entitled to relief on this claim.

## IV.   CERTIFICATE OF APPEALABILITY

The AEDPA provides that an appeal may not be taken to the court of appeals from a final order in a § 2254 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

This Court will deny a certificate of appealability because jurists of reason would not find it debatable that dismissal of the Petition is correct.

V. **CONCLUSION**

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability shall not issue. An appropriate Order follows.


Dated: April 2, 2019          s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.